*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CITY OF BATTLE CREEK,

      Plaintiff-Appellee,

v

BRYANT C. DEBOLT, SR. and JULYETTE G.
JACOBS, Trustees of the BRYANT C. DEBOLT
REVOCABLE TRUST,

      Defendants-Appellants.

UNPUBLISHED
February 16, 2023

No. 358617
Calhoun Circuit Court
LC No. 2019-003467-CZ

Before: SHAPIRO, P.J., and LETICA and FEENEY, JJ.

PER CURIAM.

      Defendants, Bryant C. DeBolt, Sr., and Julyette G. Jacobs, as Trustees of the Bryant C.
DeBolt Revocable Trust,[1] appeal as of right the order determining the amount of damages and
costs awarded in favor of plaintiff, City of Battle Creek, to abate and remove a nuisance. We
affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

      On November 27, 2019, plaintiff filed a complaint to abate a public nuisance. It was
alleged that defendant owned and controlled property located at 34 E. Michigan Avenue, Battle
Creek, Michigan. The property consisted of a three-story building fronting E. Michigan Avenue
and a six-story building fronting S. Monroe Street. In October 2018, plaintiff inspected the
property and found maintenance code violations pertaining to wood exposed to the elements and
the need to repair failing brick and stucco siding on the east side. When the violations were not
corrected by June 2019, a ticket was issued in July 2019. Plaintiff alleged that it received pictures
of the property in September 2019, and was notified that the property was quickly deteriorating

---

[1] Although Bryant C. DeBolt, Sr. and Julyette G. Jacobs, were names as co-trustees, Bryant
apparently collected and stored antiques at the property subject to the trust and testified at the
hearing. For ease of reference, the singular defendant refers to Bryant.

and posed a hazard to pedestrians and occupants of surrounding buildings. Specifically, plaintiff's chief building official, Richard Bolek, observed that a portion of the roof was missing and was open to the elements; the fifth and sixth floors had collapsed and "pancaked" the fourth floor; the collapsed floors compromised the integrity of the entire structure; a portion of the north wall had detached and fallen upon the three-story section and neighboring properties; portions of the north wall and supporting structure were compromised from rot and decay; the exterior was buckling and cracked; and the six-story portion was in imminent danger of collapse.

Plaintiff alleged that Consumers Energy had to shut down the power to prevent electrical damage, and this resulted in a loss of power to the entire block, including neighboring properties, on September 6, 2019. Plaintiff asserted that it installed a temporary fence around the subject and adjacent buildings as a safety measure at its own expense. On September 9, 2019, electrical service was restored to the neighboring properties. It was submitted that the property condition was so severe that demolition was recommended. On October 4, 2019, plaintiff issued an imminent danger notice advising that the structure was unsafe and constituted a dangerous building according to plaintiff's ordinance, § 1454.01(d). On October 21, 2019, a hearing officer declared the property dangerous and ordered defendant to repair or demolish it by November 19, 2019. Because defendant did not comply, he was advised that plaintiff would act. Consequently, plaintiff filed the underlying one-count complaint alleging nuisance and requested a temporary restraining order requiring that defendant repair or demolish within 20 days. If defendant failed to abate the nuisance, it was requested that the court authorize plaintiff to demolish the property, place a lien, and acquire enforcement rights for the costs of demolition.[2]

The trial court entered an order for preliminary injunction that precluded disposal or encumbrance of defendant's property. In August 2020, plaintiff moved for summary disposition under MCR 2.116(C)(10), requesting that the court declare the property a nuisance and issue an order protecting taxpayers from the costs of demotion and abatement. Defendant opposed the request, alleging the dispositive motion was premature and disingenuous because there were on-going meetings and meaningful efforts to resolve the problems with the property. In December 2020, the trial court entered an order granting plaintiff's motion. The written order stated that "there is no genuine issue of material fact that the six-story tower at 34 E. Michigan Avenue is a nuisance pursuant to MCL 600.2940, and the tower has been a nuisance since 2019." It was ordered that the property shall be demolished and the nuisance abated and that defendant

---

[2] Because defendant's property was located in a historic district, proceedings were held before plaintiff's historic district commission on September 16, 2019. At the hearing, defendant stated, "I don't know what to do. Tell me what to do." Later at the hearing, defendant advised that he bought the property in 1989 and was promised a liquor license. After the request was not granted, defendant decided, "I don't need to do business with [plaintiff]." He also advised that he was 80 years old and needed "some support." Shortly after the damage hearings concluded, on September 17, 2021, defendant died because of an accidental drowning in Goguac Lake, a short distance from defendant's lakefront property. <https://battlecreekenquirer.com/story/news/2021/09/24/police-say-death-bryant-debolt-accidental-drowning/5844347001/> (accessed February 9, 2023).

shall provide a safety plan to enter the property and remove personal property. The order further provided that: "Defendant shall bear all expenses to abate the nuisance including, but not limited to, demolition costs and expenses incurred by the Plaintiff to secure the Property."[3]

At a subsequent hearing, the trial court took testimony and received a report to address how the demolition would occur and whether it was safe to enter the premises to remove personal property. The trial court concluded that "demolition of the tower portion of the building may proceed forthwith." It further determined that the tower portion included the ten-feet that protruded into the middle building despite being part of the tower. The demolition was to be completed in a manner to leave the middle structure intact if possible. The trial court refused to permit defendant's entry into the building to remove personal items because of the risk of collapse.

In March 2021, a hearing was held on plaintiff's motion for additional costs and to establish a payment deadline. Plaintiff alleged that a wall covering was necessary on the exposed walls of the building to ensure the safety of the neighboring properties and the public in general. It was submitted that the rear wall used to be an interior wall between the middle portion of the building and the tower. Plaintiff asserted that the wall covering on the rear wall was governed by the trial court's prior order to abate the nuisance. And, any changes to the side wall were incidental to the placement of the temporary wall covering. It was argued that the authority to abate the nuisance by performing this work was covered by MCL 125.523, and local ordinance § 1454. Plaintiff also alleged that defendant improperly entered the premises.

In response, defendant disputed that $132,000 was necessary to secure the rear wall, contending that the demolition company, SC Environmental, failed to properly support certain walls and created the issue now deemed problematic by plaintiff. It was also asserted that the demolition crew converted the personal property of defendant and vandalized and removed the doors on antique bank safes to scrap for valuables. Defendant sought to depose the demolition company employees to address what happened to other property, such as scaffolding and I-beams,

_____

[3] A hearing on the motion for summary disposition was held on November 12, 2020. The trial court stated that, after reviewing all the evidence presented, numerous code violation and structural deficiencies existed with the tower that clearly placed any occupants of adjacent buildings and passersby to a substantial risk of harm. It was concluded that defendant failed to present any evidence to rebut the fact that the tower constituted a nuisance, was in imminent danger of collapse, and should be demolished. Therefore, the trial court granted plaintiff's motion "as it relates to the tower." The trial court concluded that the tower was a nuisance "and can be demolished forthwith pursuant to the contract that was approved by the city commissioners. Furthermore, the Defendant will bear the cost of that."

In December 2020, a hearing was held to address what engineers needed to do with the middle building to demolish the tower and whether to allow defendant to present a safety plan to remove personal items. Ross Smith, a structural engineer with Wiss, Janney, Elstner & Associates (WJE), testified regarding his visits to the property, its further deterioration, and the plan to remove the tower, but save the first two floors of the middle building. Smith opined that defendant could not safely enter the property to remove personal property until after the tower was removed and the building was secured from the elements.

and to retain and depose experts. He requested an evidentiary hearing be scheduled with an allowance for discovery.

The trial court concluded that the failure to shore up the subject wall would create an additional nuisance to the middle structure, and it granted plaintiff's request. It determined that the expense shall be borne by defendant as part of the nuisance-abatement action. The trial court advised that defendant could not enter the property until the work was complete and the property was structurally sound. The trial court concluded that an evidentiary hearing was required to address payment and timing. It declined to grant discovery at that time.

A continuing dispute between the parties was whether defendant violated the court's order and entered the unsafe premises and whether plaintiff's agents or employees converted the personal property in the building. However, the trial court did not conduct a hearing regarding any unauthorized entry by defendant and noted that defendant did not file a counterclaim for conversion. Consequently, the trial court declined to address those issues.

The trial court conducted multiple hearings and received testimony regarding the work performed at the property, any personal property taken therefrom, and the payment for the work performed. Charles Douglas Adams, director of operations for SC Environmental, oversaw the demolition and cleanup of the property. The demolition crew did their best to secure the property. Temporary fencing surrounded the area, the equipment that could not be removed was locked, and the trucks were stored at a separate location. Adams was asked to look for the bank safes possibly stored in the basement at the premises and found five or six safes on the first floor. The safes were set aside in the courtyard area, and he denied that the demolition crew removed the doors of the safes. Adams testified that the company was not permitted to take salvage, items that could be reused at the premises, but was entitled to remove scrap. If items were taken for scrap, they were not placed in a landfill, and the demolition company was entitled to retain the scrap proceeds. He advised that this was the standard in this type of contract. The parties stipulated that SC Environmental received $3,488.84 from scrap. Adams denied that the demolition crew removed items such as scaffolding, safe doors, I-beams, and an antique machine gun.

Ted Dearing, plaintiff's assistant city manager, was familiar with the events pertaining to defendant's E. Michigan Avenue property. He testified that, after approval by the city commission, plaintiff engaged SC Environmental to conduct the demolition of the tower to abate the nuisance and the final invoice was for $184,624. Plaintiff also paid WJE $39,811.49 for engineering services. In addition to the payment to those two entities, there were expenses incurred by plaintiff to have city personnel monitor and work on the project. These expenses included site visits, material costs, fencing, and other miscellaneous costs. The personnel necessary to address the property condition included police and fire, department of public works employees, and code and inspection employees, and their time dedicated to the project was tracked through a work order. Dearing identified a project transaction report that tracked staff time and expenses of $12,132.17. Finally, Hackett Construction was contracted to place a wall covering at the property for $132,000, but it was completed for $118,359.84. The total amount of reimbursement requested by plaintiff from defendant was $354,927.50.

Dearing acknowledged that plaintiff did not have sufficient general funds available to pay to abate the nuisance. Consequently, plaintiff sought funding from the City of Battle Creek's

-4-

Downtown Development Authority (DDA) to pay for the majority of the demolition. On cross-examination, Dearing testified about the DDA's involvement:

> *Q.* There have been no general funds of the city used for any of this demolition project?
>
> *A.* Well, it- -it's not accurate that there have been no general fund dollars in the project as a whole, but there were no general fund dollars in this- -used for this specific contract.
>
> *Q.* Okay. Very good. And so, as a result of that, whatever monies were paid for the demolition project, would have come from the DDA funds, correct?
>
> *A.* That is correct.

Upon questioning by the court, Dearing acknowledged that the general fund did not have the budget to pay for the abatement of the nuisance. He also acknowledged there was no formal written agreement between plaintiff and the DDA, but the meeting minutes recorded their agreement. Dearing testified:

> *Q.* Well, Mr. Dearing, do you know what the agreement was with the DDA from your position with [plaintiff]?
>
> *A.* Yes, I do, You Honor. I am the administrator for the DDA on behalf of [plaintiff].
>
> *Q.* Very good. Thank you. Can you tell me what the agreement was between the DDA and [plaintiff]?
>
> *A.* . . . Your Honor, I–I am the administrator for [plaintiff] with the DDA. I was the one that made the request of the DDA to provide funding for this project. They agreed with the understanding that, if [plaintiff] was to recoup funds from the building owner, that they would then be reimbursed.
>
> *Q.* All right. So, this is essentially a loan from the DDA?
>
> *A.* . . . There is no expectation of being repaid, it's just that if we are able to recoup funds, we will reimburse the DDA.

Dearing explained that the DDA was an incremental tax financing authority (TIFA) primarily within plaintiff's downtown area that captured incremental tax revenue for the redevelopment of the downtown area, and defendant's property was located within the district. Plaintiff, as the taxing authority, captured the tax and provided financial oversight of the DDA as a component unit of plaintiff. Plaintiff and the DDA had a cooperative relationship and worked together to address nuisance properties.

Bolek, plaintiff's chief building official, discussed the demolition with Adams of SC Environmental and was initially present for the first day of demolition but left the contractors to

do their work. The demolition entailed removal of a building that was part of the center and making it an exterior wall. Therefore, the exterior of the building had to be secured at the conclusion of the demolition. Additionally, the contract provided that SC Environmental had to send everything to a landfill unless it was scrapped; however, the demolition company could not retain items that were salvageable. Bolek described salvaging as taking items from the scene and reselling them or using them in another fashion while scrapping was recycling items instead of placing them in a landfill. SC Environmental was told to dispose of items around the building to complete the demolition without further direction.

A witness to the demolition, John Compton, and defendant testified regarding items removed from the property and damage to items at the property. Even so, defendant never formally filed a counterclaim for conversion. Additionally, defendant did not present experts to address the structure of the building and the propriety of the demolition and remedial actions by SC Environmental and Hackett Construction.

After multiple hearings, on September 1, 2021, the trial court entered a corrected order addressing damages. The order provided:

> Defendant in the instant case is the owner of a property located in the City of Battle Creek. In a prior hearing, the property at issue was determined to be a nuisance and Defendant was ordered to bear the expense of abating the nuisance, to include the cost of demolition and related expenses incurred by the Plaintiff. In order to secure and make safe the property in question, the City of Battle Creek spent a total of $354,927.50.
>
> Plaintiff hired WJE Engineers & Architects, PC to assess the property and determine the scope of the project. $39,811.49 was paid to WJE for their services. After the property was assessed, Plaintiff hired SC Environmental Services LLC to complete the demolition of the nuisance property. The total cost of demolition was $184,624.00. Additionally, the City of Battle Creek incurred $12,132.17 in expenses related to fencing, wages, parking passes, and other costs and fees. Per the testimony of Assistant City Manager Ted Dearing, these expenses were directly related to the nuisance created by Defendant's property. At a hearing on March 12, 2021, it was determined that there was a need to construct a temporary wall covering to preserve the remaining structure. Defendant was ordered to bear the cost of this addition as part of the nuisance abatement. The total cost for the temporary wall covering was $118,359.84, owed to Hackett Construction. There was no testimony or evidence provided by Defendant disputing that these were, in fact, the amounts paid to abate the nuisance created by allowing it's [sic] building to fall into a state of disrepair such that it created a risk of harm to the community.
>
> Defendant argues that the City did not incur the expense for the demolition of the nuisance property, and therefore, the trust is not obligated to reimburse Plaintiff. However, the order after summary disposition stated that Defendant "shall bear all expenses to abate the nuisance, including but not limited to demolition costs and expenses incurred by the Plaintiff to secure the property." There was no language in the order granting Defendant an exception for any costs

paid by the City with money obtained or borrowed through the Downtown Development Association, a bank or any other entity. Defendant must bear the cost of the demolition and all related expenses. Further, Defendant is not entitled to a credit for the $3,488.00 obtained from that scrapping (or recycling) of materials [that] is done in the regular course of business and that cleaning up of the demolition sight [sic] was part of the contract. Finally, Defendant is not entitled to any credit toward the cost of re-establishing electricity to the building. The electricity was turned off/removed as part of the nuisance abatement. If Defendant wishes to have it repaired or reconnected, he may do so at his own cost. It would not have been necessary to disconnect or remove the electric system if the building had been kept in an appropriate and safe condition.

Therefore, after hearing testimony, examining the exhibits presented and reviewing the written pleadings, it is ordered that:

(1) Defendant pay Plaintiff a sum of $354,927.50 of the cost incurred to abate the nuisance.

(2) The payment of $354,927.50 is to be made on or before September 30, 2021.

(3) Any portion not paid by September 30, 2021 may be secured by lien on any and all properties held by Defendant trust. These included, but are not limited to: 34 E. Michigan Avenue, Battle Creek, Michigan; 918 Capital Avenue, SW, Battle Creek, Michigan; 17 Waweenork [sic] Drive, Battle Creek, Michigan; and Lot No. 72 of Park Beidler, Calhoun County, Michigan, to include beach reserve rights to Goguac Lake. Lien may be secured by recording this order, as well as an affidavit from Plaintiff's counsel. Plaintiff may, after September 30, 2021, take any necessary steps to satisfy or execute upon its lien.

(4) Interest shall accrue pursuant to MCL 600.6013.

(5) Defendant shall not transfer or dispose of any property that is owed to Plaintiff without further order of the court.

From this order, defendant appeals.

## II. NUISANCE DAMAGE AWARD[4]

Defendant alleges that plaintiff could not recover the costs of demolition and to abate the nuisance because the costs were not "incurred" when the DDA, not plaintiff, supplied the primary

---

[4] We note that defendant did not challenge the trial court's determination that the tower constituted a nuisance that must be abated and the grant of summary of summary disposition to plaintiff on this basis.

funding for the project. Because of the DDA's funding, defendant further submits that plaintiff did not have standing and was not the real party in interest. We disagree.[5]

### A. STANDARDS OF REVIEW

On appeal, the trial court's factual findings rendered in a bench trial are reviewed for clear error, but its conclusions of law are reviewed de novo. *Florence Cement Co v Vettraino*, 292 Mich App 461, 468; 807 NW2d 917 (2011). "A factual finding is clearly erroneous if there is no substantial evidence to sustain it or if, although there is some evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 172; 848 NW2d 95 (2013). The clear error review of factual findings also gives deference to the trial court's superior ability to assess the credibility of the witnesses. *Id*. at 172.

This Court reviews de novo the legal question whether a party has standing. *Connell v Lima Twp*, 336 Mich App 263, 281; 970 NW2d 354 (2021). Unpreserved issues are reviewed for plain error affecting substantial rights. *Veneskey v Sulier*, 338 Mich App 539, 554; 980 NW2d 551 (2021).[6] To avoid forfeiture under the plain error rule, an error must have occurred, the error must be plain, i.e., clear or obvious, and the plain error must affect substantial rights. *Marik v Marik*, 325 Mich App 353, 359; 925 NW2d 885 (2018). To establish plain error that affected substantial rights, the party must demonstrate prejudice by the error such that it affected the outcome of the proceedings. See *Henderson v Dep't of Treasury*, 307 Mich App 1, 9; 858 NW2d

---

[5] Generally, to preserve an issue for appellate review, an issue must be raised, addressed, and decided by the trial court. *Hartfiel v City of Eastpointe*, 333 Mich App 438, 453; 960 NW2d 174 (2020). Defendant challenged the damages incurred by plaintiff in the trial court by alleging that the DDA's payment for the demolition and related costs demonstrated that plaintiff was not held responsible for and did not incur damages. This issue is preserved for appellate review. Defendant admits that the claims pertaining to standing and real party in interest were not preserved for appellate review. Although an issue is unpreserved, preservation requirements may be overlooked if the failure to address an issue would result in manifest injustice, if resolution of an issue is necessary for a proper determination of the case, or if the issue presents a question of law and the necessary facts required for resolution of the issue have been presented. *Shah v State Farm Mut Auto Ins Co*, 324 Mich App 182, 192-193; 920 NW2d 148 (2018). The appellate court's inherent power to review an unpreserved claim of error is to be exercised quite sparingly and exercised only under compelling circumstances such as to avoid a miscarriage of justice. *Id*. at 193 citing *Napier v Jacobs*, 429 Mich 222, 233; 414 NW2d 862 (1987). Defendant does not argue this Court should exercise its discretion and address the issue of standing and real party in interest because of compelling circumstances.

[6] But see *In re Murray*, 336 Mich App 234, 240-242; 970 NW2d 372 (2021), wherein this Court noted that our Michigan Supreme Court had not expressly adopted the plain error affecting substantial rights standard of *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), in civil cases. Therefore, the *Murray* Court exercised its discretion to address the issue because it presented a question of law for which all necessary facts were presented. *Murray*, 336 Mich App at 242.

733 (2014). The appellant bears the burden of persuasion with regard to prejudice. *In re Knight*, 333 Mich App 681, 687; 963 NW2d 676 (2020).

The issue of whether a plaintiff is the real party in interest also presents a question of law subject to review de novo. *Id*. When this issue is unpreserved, the review is for plain error. *Id*.

## B. PLAINTIFF'S DAMAGES FOR NUISANCE

A nuisance action may arise by common-law, statute, and local ordinance. In *Sholberg v Trumain*, 496 Mich 1, 6-7; 852 NW2d 89 (2014), our Supreme Court discussed public nuisance:

> A public nuisance involves the unreasonable interference with a right common to all members of the general public. No better definition of a public nuisance has been suggested than that of an act or omission which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all Her Majesty's subjects. There is no doubt that nuisance is a tort. In general, even though a nuisance may exist, not all actors are liable for the damages stemming from the condition. A defendant held liable for the nuisance must have possession or control of the land. [*Id*. (citations, quotation marks, and punctuation marks omitted).]

The *Sholberg* Court concluded that liability for a nuisance was not merely premised on ownership but also control:

> To be liable for nuisance, it is not necessary for an individual to own the property on which the objectionable condition is maintained, but rather, liability for damages turns on whether the defendant controls the property, either through ownership or otherwise. A person is liable if he or she knowingly permits the creation or maintenance of a nuisance on premises of which he or she has control even though such person does not own the property or even though such person is not physically present, such as where he or she is an absentee owner. A party who has no control over the property at the time of the alleged nuisance cannot be held liable therefor. [*Id*. at 12-13 (citations omitted).]

An absentee landowner may be responsible for a nuisance when it knowingly permitted the creation or maintenance of the nuisance on the property. *Id*. at 13.

To allow meaningful appellate review of the costs incurred in abating a nuisance, the trial court should engage in a cost-by-cost analysis to ascertain the expenses necessary to properly abate the nuisance. See *Ypsilanti Fire Marshal v Kircher (On Reconsideration)*, 273 Mich App 496, 535-536; 730 NW2d 481 (2007), remanded on other grounds 480 Mich 910; 739 NW2d 622 (2007). It should consider the necessity and appropriateness of each incurred expense. *Id*. at 536. Indeed, regardless of the type of nuisance, the trial court may abate the nuisance at the expense of the property owner. *Id*. at 538, citing MCL 600.2940(3). And, the costs incurred to abate a nuisance may be collected in the same manner as debt collection on execution. *Id*. at 538-539.

In addition to a nuisance established at common-law, statutes govern nuisance and necessary demolition of dangerous buildings.

Issues involving statutory interpretation present questions of law that are reviewed de novo. The primary goal of statutory interpretation is to give effect to the intent of the Legislature. The most reliable evidence of legislative intent is the plain language of the statute. If the language of the statute is clear and unambiguous, it is presumed that the Legislature intended the meaning plainly expressed in the statute. The court's interpretation of a statute must give effect to every word, phrase, and clause. Further, an interpretation that would render any part of the statute surplusage or nugatory must be avoided. Common words and phrases are given their plain meaning as determined by the context in which the words are used, and a dictionary may be consulted to ascertain the meaning of an undefined word or phrase. In construing a legislative enactment we are not at liberty to choose a construction that implements any rational purpose but, rather, must choose the construction which implements the legislative purpose perceived from the language and the context in which it is used. [*Le Gassick v Univ of Mich Regents*, 330 Mich App 487, 494-495; 948 NW2d 452 (2019) (citations and quotation marks omitted).]

MCL 600.2940[7] addresses actions brought in circuit court to abate nuisances, whether public or private, and provides:

(1) All claims based on or to abate nuisance may be brought in the circuit court. The circuit court may grant injunctions to stay and prevent nuisance.

(2) When the plaintiff prevails on a claim based on a private nuisance, he may have judgment for damages and may have judgment that the nuisance be abated and removed unless the judge finds that the abatement of the nuisance is unnecessary.

(3) If the judgment is that the nuisance shall be abated, the court may issue a warrant to the proper officer, requiring him to abate and remove the nuisance at the expense of the defendant, in the manner that public nuisances are abated and removed. The court may stay the warrant for as long as 6 months to give the defendant an opportunity to remove the nuisance, upon the defendant giving satisfactory security to do so.

(4) The expense of abating and removing the nuisance pursuant to such warrant, shall be collected by the officer in the same manner as damages and costs are

---

[7] Defendant submitted that MCL 600.2940 only applied to nuisances as defined in MCL 600.3801(1)(a)-(g), and those subsections address nuisances arising from criminality or violations of the penal code. Defendant cites no authority for his contention that MCL 600.2940 is limited by MCL 600.3801(1)(a)-(g). When a party announces a position without citing supporting authority, the issue is deemed to be abandoned. *Hooker v Moore*, 326 Mich App 552, 557 n 2; 928 NW2d 287 (2018). More importantly, the plain language of MCL 600.2940 addressing nuisance-abatement actions filed in circuit court contains no such limitation. In light of defendant's failure to present supporting authority, *id.*, and that his contention is contrary to the plain language of the statute, *Le Gassick*, 330 Mich App at 495, we reject his blanket assertion.

-10-

collected upon execution, excepting that the materials of any buildings, fences, or other things that may be removed as a nuisance, may be sold by the officer, in like manner as goods are sold on execution for the payment of debts. The officer may apply the proceeds of such sale to defray the expenses of the removal, and shall pay over the balance thereof, if any, to the defendant upon demand. If the proceeds of the sale are not sufficient to defray the said expenses, he shall collect the residue thereof as before provided.

(5) Actions under this section are equitable in nature unless only money damages are claimed.

In the present case, plaintiff received complaints regarding the subject property in which defendant held an interest. An occupant of a neighboring property advised that the building was subject to the elements and falling debris could injure neighboring properties and pedestrians. After the inspection of the property and attempts to bring it into compliance failed, a circuit court action was appropriately filed seeking injunctive relief. MCL 600.2940(1). Although defendant was given time to remedy the problems and attempts at negotiation with third parties failed, plaintiff moved for and obtained summary disposition with the trial court concluding that the tower portion of the building constituted a nuisance. Accordingly, the court ordered plaintiff to abate the nuisance and remove the nuisance at defendant's expense. MCL 600.2940(3). The plain language of MCL 600.2940(3) places no restriction on the type of nuisance subject to abatement, i.e., public or private, and there is no restriction on the underlying cause of the nuisance, i.e., dangerous building or violation of penal code. Plaintiff received bids and sought court authorization to proceed. By statute, plaintiff's representative "shall" collect the expense of abating and removing the nuisance authorized by the court. MCL 600.2940(4). The term "shall" denotes mandatory action while the word "may" is permissive, and we must apply the ordinary and accepted meaning of these terms unless to do so would frustrate legislative intent. *Cheesman v Williams*, 311 Mich App 147, 151; 874 NW2d 385 (2015). Thus, plaintiff was required to collect for the expense of abating and removing the nuisance. The plain language of the statute places no limitation on the expenses or require that they be "incurred." Accordingly, the trial court did not clearly err in ordering that the nuisance be abated at the expense of the property owner. *Ypsilanti Fire Marshal*, 273 Mich App at 538.

We note that Battle Creek Local Ordinance § 1454.04(f) addresses the cost of demolition and refers to costs incurred, stating in pertinent part: "The cost of the demolition, of making the building safe, or of maintaining the exterior of the building . . . incurred by the City to bring the property into conformance with this chapter, shall be reimbursed to the City by the owner or party in interest[.]" Defendant submits that plaintiff did not incur any expenses because the DDA paid for portions of the demolition and to abate. He relies on the term "incur" as defined to mean "[t]o become liable or subject to, [especially] because of one's own actions." See *Covenant Med Ctr, Inc v State Farm Mut Auto Ins Co*, 500 Mich 191, 207; 895 NW2d 490 (2017) superseded by statute. However, it is apparent that plaintiff, not defendant, meets the definition of the term "incur" because it entered into contractual agreements for services to demolish and abate the nuisance by removing the tower and taking the debris to a landfill. In exchange for these services, plaintiff was required to pay SC Environmental and Hackett Construction. The DDA did not enter into contractual agreements for services; rather, it merely provided a funding source and did not incur liability as a result of its own actions. Defendant's challenge is without merit.

-11-

## C. STANDING

Defendant further submits that plaintiff did not have standing to pursue the action because the DDA provided the funding to abate the nuisance. We disagree.

Standing generally references a plaintiff's right to invoke the trial court's power to adjudicate a claimed injury. *Connell*, 336 Mich App at 289. In *Trademark Prop of Mich, LLC v Fannie Mae*, 308 Mich App 132, 136-137; 863 NW2d 344 (2014), this Court explained the doctrine of standing:

> The purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to ensure sincere and vigorous advocacy. That is, the objective of the standing requirement is to ensure that only those who have a substantial interest will be allowed to come in to court to complain. When a party's standing is challenged in a case, the question is whether that person is a proper party to request adjudication of the issue, not whether the issue is justiciable. Standing in no way depends on the merits of the case. When a cause of action exists under law, or when the Legislature has expressly conferred standing, those circumstances are sufficient to establish standing. [citations and quotation marks omitted.]

In *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010), our Supreme Court addressed how to determine whether a litigant has standing:

> We hold that Michigan standing jurisprudence should be restored to a limited, prudential doctrine that is consistent with Michigan's longstanding historical approach to standing. Under this approach, a litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment. Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant.

"A public nuisance is an unreasonable interference with a common right enjoyed by the general public." *Cloverleaf Car Co v Phillips Petroleum Co*, 213 Mich App 186, 190; 540 NW2d 297 (1994).

> The term "unreasonable interference" includes conduct that (1) significantly interferes with the public's health, safety, peace, comfort, or convenience, (2) is proscribed by law, or (3) is known or should have been known by the actor to be of a continuing nature that produces a permanent or long-lasting, significant effect on these rights. A private citizen may file an action for a public nuisance against an actor where the individual can show he suffered a type of harm different from that of the general public . . . .

In general, even though a nuisance may exist, not all actors are liable for the damages stemming from the condition. A defendant is liable for a nuisance where (1) the defendant created the nuisance, (2) the defendant owned or controlled the land from which the nuisance arose, or (3) the defendant employed another person to do work from which the defendant knew a nuisance would likely arise. [*Id*. at 190-191 (citations omitted).]

"A violation of a zoning ordinance constitutes a public nuisance that, by itself, 'gives no right of action to an individual and must be abated by the appropriate public officer.' " *Ansell v Delta Co Planning Comm*, 332 Mich App 451, 461; 957 NW2d 47 (2020). Claims to abate a nuisance must be brought in circuit court, MCL 600.2940(1), and the court may order a government officer to abate the nuisance at the defendant's expense, MCL 600.2940(3).

Defendant does not dispute that plaintiff claims common-law, statutory, and local ordinance violations arising from the condition of the subject building that constitute a public nuisance. The zoning ordinance violation, as a public nuisance, must be abated by plaintiff. *Ansell*, 332 Mich App at 461. Standing is not contingent on the merits of the case, but rather, when a cause of action exists under law, such as for public nuisance, that is sufficient to establish standing. See *Lansing Sch Ed Ass'n*, 487 Mich at 372. Defendant does not dispute that a nuisance was presented, and he does not dispute that two contractors were engaged to remove the tower and to secure the premises. Rather, he complains that because plaintiff did not provide the general funds to its contractors, but obtained the funding from the DDA, it did not "incur" the expense. Regardless of whether plaintiff could meet its evidentiary proofs to support recovery, plaintiff had standing to bring the action for public nuisance. *Ansell*, 332 Mich App at 461; see also MCL 600.2940(1) and (3). The challenge to standing is without merit.

## D. REAL PARTY IN INTEREST

Defendant also contends that plaintiff was not the real party in interest because the DDA provided the funding for the demolition and abatement. Again, we disagree.

An action must be prosecuted in the name of the real party in interest[.]" MCR 2.201(B). To be the real party in interest, the party must be vested with a right of action to a given claim, even if the beneficial interest lies with another. *Bd of Trustees v City of Pontiac*, 309 Mich App 611, 621; 873 NW2d 783 (2015).

Defendant submits the same argument with regard to damages and standing to the question of who is the real party in interest: because the DDA paid for the demolition and abatement of the nuisance, it was the real party in interest. However, by statute, MCL 600.2940(4) ("The expense of abating and removing the nuisance pursuant to such warrant, shall be collected by the officer in the same manner as damages and costs are collected upon execution . . .") and local ordinance § 1454.04(f), ("The cost of the demolition, of making the building safe, or of maintaining the exterior of the building or structure or grounds adjoining the building or structure, incurred by the City to bring the property into conformance with this chapter, shall be reimbursed to the City by the owner or party in interest in whose name the property appears."), plaintiff was charged with abating and removing a nuisance, and therefore, it follows that plaintiff may bring a public nuisance suit to compel performance and payment from the defendant that created the condition.

-13-

The DDA is not the entity charged with abating nuisances. Rather, the DDA is an entity that utilizes "captured" tax increases to fund properties within a particular district. See *Village of Holly v Holly Twp*, 267 Mich App 461, 463; 705 NW2d 532 (2005). Accordingly, defendant's claim that plaintiff is not the real party in interest is without merit.

## III. COMPUTATION OF DAMAGES

Defendant contends that the trial court erred in awarding as costs of abatement the general overhead costs and wall covering and in allowing SC Environmental to retain funds received from scrapping. We disagree.

"Where a court following a bench trial has determined the issue of damages, we review the award for clear error." *Marshall Lasser, PC v George*, 252 Mich App 104, 110; 651 NW2d 158 (2002). A nonjury award will not be set aside merely premised on a difference of opinion. *Id*. Clear error exists where, after a review of the record, the reviewing court is left with a firm and definite conviction that a mistake has been made." *Id*.

A damage award is not clearly erroneous where the damage award was within the range of the evidence presented, and the trial court was aware of the issues in the case and appropriately applied the law. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 513; 667 NW2d 379 (2004). If damages are speculative or premised on conjecture, they are not subject to recovery. *Chelsea Investment Group LLC v Chelsea*, 288 Mich App 239, 255; 792 NW2d 781 (2010). Damages need not be calculated with mathematical certainty; it is sufficient when a reasonable basis for computation exists. *Id*. Additionally, any certainty requirement is relaxed when the fact of damages has been established, and the only issue to be determined is the amount of damages. *Ensink v Mecosta Co Gen Hosp*, 262 Mich App 518, 525; 687 NW2d 143 (2004). Questions of what damages might reasonably be anticipated in a tort action is appropriately left to the fact-finder. *Id*. Precision in damages will not be required when, from the nature of the circumstances, precision is not attainable. *Purcell v Keegan*, 359 Mich 571, 576; 103 NW2d 494 (1960). This is particularly true when the defendant's own act or negligence caused the imprecision. *Id*.

Battle Creek Local Ordinance § 1454.04(f) addresses cost of demolition and provides:

> *The cost of the demolition, of making the building safe, or of maintaining the exterior of the building or structure or grounds adjoining the building or structure, incurred by the City to bring the property into conformance with this chapter, shall be reimbursed to the City by the owner or party in interest in whose name the property appears.* The cost of demolition, making the building safe, or of maintaining the exterior of the building or structure and grounds adjoining the building or structure *includes but is not limited to*, fees paid to hearing officers, costs of title searches or commitments used to determine the parties in interest, recording fees for notices and liens filed with the County Register of Deeds, demolition and dumping charges, court reporter attendance fees, and costs of the collection of the charges authorized under this chapter, including but not limited to the costs of placarding and vacating a dangerous building. [Emphasis added.]

Defendant contends that the trial court clearly erred in awarding overhead costs, including the costs of employees supervising the project because Dearing's testimony was uncertain and speculative. However, Dearing testified that the employees prepared their time cards and allocated the amount of time expended on this project. Additionally, he testified that the time spent on this project, by employees of police, fire, and rescue, was time taken away from other responsibilities. Dearing did not have personal knowledge of each employee's work at the project. But, because the employees correlated their time to this project, the finance department prepared a project transaction report in the ordinary course of business that served as the basis for Dearing's testimony. Dearing further acknowledged that there were miscellaneous charges for other items such as parking, register of deed fees, etc.

Defendant contends that, in criminal cases, a defendant cannot be charged for the costs of the investigation or the operation of the probation department. In the present case, however, plaintiff has an ordinance that expressly provides that operational charges, such as fees charged by the register of deeds, are costs incurred by plaintiff and recoverable from the property owner. Moreover, the local ordinance notes that the cost items delineated served as examples and was not confined to those items. Under the circumstances, the trial court did not clearly err in its award of general overhead expenses. While it may be improper to render such an award in the context of criminal cases, by statute and local ordinance, a property owner becomes responsible for miscellaneous charges incurred by the government entity remediating the nuisance.

Next, defendant asserts that the $132,000 wall covering was not an expense required for the demolition and necessary to abate the nuisance. We disagree. As noted, this building included a tower that collapsed and the fifth and sixth floors had pancaked into the lower levels. The trial court only ordered that the tower constituted a nuisance. Thus, the engineers and demolition crew acted to remove the tower while causing as little impact to the remaining structures as possible. When an evaluation of the tower occurred, plaintiff's representative apprised the trial court that the collapse would require action pertaining to ten-feet into the middle building. After this initial work was performed, it was determined that a wall covering was required to prevent the remainder from becoming a nuisance. Specifically, the wall covering was necessary to address the exposed walls of the building and to ensure the safety of the neighboring properties and the public in general. The trial court concluded that the failure to shore up the additional wall would create an additional nuisance to the middle structure, and it granted plaintiff's request to add the temporary walls.

Defendant now protests the necessity of this expense, but he did not present any expert testimony to contradict the assertion by plaintiff and its representatives that the wall covering was required to abate the nuisance. In light of defendant's failure to contradict the evidence presented, we cannot conclude the trial court's factual findings pertaining to the wall covering were clearly erroneous.

Lastly, defendant contends that the trial court erred in failing to order that the scrap metal funds received by SC Environmental in the amount of $3,488.84 should be given to defendant. We disagree.

The testimony elicited at the evidentiary hearings demonstrated that SC Environmental was entitled to remove debris from the premises, was not entitled to salvage items from the property,

but was granted the opportunity to scrap from the debris. Scrapping consisted of preventing items from being taken to a landfill. Adams denied that the demolition crew removed items of value, such as scaffolding, safe doors, and I-beams, from the premises. Bolek testified that that actions by SC Environmental were consistent with the contract and their directions. Moreover, the trial court apprised defendant that he could formally pursue an action for conversion of personal property. Under the circumstances, we cannot determine that the trial court clearly erred.

Affirmed. Plaintiff, as the prevailing party, may tax costs. MCR 7.219(A).


/s/ Douglas B. Shapiro
/s/ Anica Letica
/s/ Kathleen A. Feeney